William J. O'Brien (Bar No. 99526)
Email: wobrien@onellp.com
Marc S. Williams (Bar No. 198913)
Email: mwilliams@onellp.com
Joseph K. Liu (Bar No. 216227)
Email: jliu@onellp.com
**ONE LLP**
301 Arizona Avenue, Suite 250
Santa Monica, California 90401
Telephone:  (310) 866-5157
Facsimile:   (310) 943-2085

Attorneys for Plaintiff,
Gem & I Products, Inc.

FILED
CLERK, U.S. DISTRICT COURT

JUL 1 2 2010
12:48

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEM & I PRODUCTS, INC., a California corporation,<br><br>        Plaintiff,<br><br>v.<br><br>DISNEY CONSUMER PRODUCTS, INC., a California corporation; GLOBAL DESIGN CONCEPTS, INC., a Delaware corporation; JUICY COUTURE, INC., a California corporation; and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No. SACV10-1051-AG(RNBx)<br><br>COMPLAINT FOR:<br><br>(1)  BREACH OF IMPLIED CONTRACT<br>(2)  FRAUD<br>(3)  INTENTIONAL INTERFERENCE WITH CONTRACT<br>(4)  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE<br>(5)  BREACH OF WRITTEN CONTRACT<br>(6)  PATENT INFRINGEMENT (35 U.S.C. §§ 271, 281)<br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT**

1    Gem & I Products, Inc. alleges:

2

3                          **JURISDICTION AND VENUE**

4        1.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 1338(a)

5    because this matter arises under the patent laws of the United States (35 U.S.C. §§ 271 and

6    281). This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Gem & I's

7    California state-law claims for breach of implied contract, fraud, intentional interference

8    with contract, intentional interference with prospective economic advantage and breach of

9    written contract.

10       2.    Venue is proper in this District under 28 U.S.C. § 1391(b) for the following

11   independent reasons:

12            a.   At least one of the Defendants resides in this District, and all

13       Defendants reside in this State within the meaning of 28 U.S.C. § 1391(c);

14       and

15            b.   A substantial part of the events or omissions giving rise to the

16       claims occurred, or a substantial part of property that is the subject of the

17       action is situated, in this District.

18       3.    Venue in this District is also proper under 28 U.S.C. § 1400(b) because Disney

19   Consumer Products, Inc. ("Disney") and Juicy Couture, Inc. each committed acts of patent

20   infringement in this District and have a regular and established place of business in this

21   District and because Disney and Juicy Couture each reside in this District within the

22   meaning of 28 U.S.C. § 1400(b).

23

24                               **PARTIES**

25       4.    Gem & I is a corporation formed under the laws of the State of California with

26   its principal place of business in San Clemente, California. Gem & I is owned principally

27   by spouses Lisa and Christopher Landay.

28

                                         1
                                    **COMPLAINT**

1    5.    Plaintiff is informed and believes and, on that basis, alleges that Defendant
2    Disney is a corporation formed under the laws of the State of California with its principal
3    place of business in Burbank, California.

4    6.    Plaintiff is informed and believes and, on that basis, alleges that Defendant
5    Global Design Concepts ("GDC") is a corporation formed under the laws of the State of
6    Delaware with its principal place of business in New York, New York.

7    7.    Plaintiff is informed and believes and, on that basis, alleges that Defendant
8    Juicy Couture is a corporation formed under the laws of the State of California with its
9    principal place of business in Los Angeles, California.

10    8.    The true names or capacities, whether individual, corporate or otherwise, of
11    the Defendants named herein as DOES 1 through 10, inclusive, are unknown to Gem & I,
12    who therefore sues said Defendants by such fictitious names. Gem & I will ask leave of
13    Court to amend this Complaint and insert the true names and capacities of DOES when
14    they have been ascertained.

15    9.    Gem & I is informed and believes and, on that basis, alleges that each of the
16    Defendants designated herein as a "DOE" is legally responsible in some manner for the
17    events and happenings herein alleged, and that Gem & I's damages as alleged herein were
18    proximately caused by DOES.

19
20                              **SUMMARY OF CLAIMS**

21    10.    Gem & I asserts the following claims:

22        a.    Against Disney for breach of implied contract under California
23    law,

24        b.    Against Disney for fraud under California law,

25        c.    Against Disney for intentional interference with contract under
26    California law,

27        d.    Against Disney for intentional interference with prospective
28    economic advantage under California law,

2

**COMPLAINT**

e.   Against GDC for breach of contract, and

f.   Against Disney and Juicy Couture for patent infringement (35

U.S.C. §§ 271, 281).

## FACTS COMMON TO ALL COUNTS

### A. Lisa Landay Invents the "Pack 'N Wrap."

11.    Lisa Landay is an experienced designer in the apparel and retail market.  She has worked at several major companies, and has been responsible for designing, planning, and producing multi-million dollar product lines year after year.  She is also a mother, whose daughter went on sleepovers with friends.

12.    Landay realized that there was an unfulfilled need for a convenient way of carrying a bulky sleep cover (such as a sleeping bag or blanket) along with personal items for a sleepover.  In response, Landay invented a girls' and boys' sleepover pack that she named the "Pack 'N Wrap."  The Pack 'N Wrap consists of an outer wrap that has pockets to hold personal items like pajamas, a change of clothes, a toothbrush and toothpaste.  The outer wrap is designed to enclose a rolled-up sleep covering, like a sleeping bag or blanket.  The Pack 'N Wrap allows girls and boys to conveniently carry in one pack their personal sleepover items as well as a sleep covering.  Thorough market research confirmed that there were no similar products on the market, providing an attractive business opportunity.

13.    Landay completed a Pack 'N Wrap prototype in October 2002.  Over the next two years, while working at another fulltime job, Landay and her husband, Chris, further developed and perfected the Pack 'N Wrap design.  During that period, Landay was also developing other product lines, including large and small picnic packs, an adult camp pack, a play pack, a yoga/gym pack, and a diaper bag series.  In August 2004, the Landays incorporated Gem & I to pursue related business opportunities.

14.    On May 23, 2005, Landay filed a patent application for sleepover packs, including the then-current version of the Pack 'N Wrap.  That application resulted in the United States Patent and Trademark Office issuing Patent No. 7,171,707 on February 6,

3

1   2007.  The '707 Patent lists Lisa A. Landay as the inventor and Gem & I as the assignee of

2   all right, title and interest in and to the '707 Patent.  A true and correct copy of the '707

3   Patent is Exhibit A.

4        15.   In July 2005, Lisa Landay began working full time for Gem & I.  The Landays

5   invested their life savings in the company.

6        16.   In January 2006, Gem & I received the first Pack 'N Wrap production units,

7   which had been manufactured for Gem & I in China by Sun XinFa Arts Manufacturer

8   Limited ("Sun XinFa").  Gem & I showed Pack 'N Wrap production units at trade shows

9   and drew enthusiastic interest from multiple large buyers.

10      **B.  Disney Is Excited about the Pack 'N Wrap.**

11       17.   In February 2006, Lisa Landay was introduced to DeAnne Abraham, a Disney

12  executive and key buyer for Disney's indoor products division.  Landay and Abraham

13  spoke on the telephone and exchanged several emails.  Landay gave Abraham a link to the

14  Gem & I website and a proposed mock-up of the Pack 'N Wrap customized for Disney.

15  Landay also informed Abraham that Gem & I had a patent application pending for the Pack

16  'N Wrap.

17       18.   Abraham was excited about the Pack 'N Wrap and informed Landay that Gem

18  & I would have to work with a Disney-approved vendor.  Abraham sent Gem & I a list of

19  three such vendors:  Idea Nuevo, Fashion Accessory Bazaar ("FAB") and Spin Master.  It

20  was understood between Landay and Abraham that Gem & I would participate and be

21  compensated if Disney pursued the Pack 'N Wrap.  Based on that understanding, Landay

22  sent a sample of the Pack 'N Wrap to Abraham, focused Gem & I's efforts largely on

23  products to be sold to Disney, and proceeded to contact Idea Nuevo, FAB and Spin Master.

24      **C.  Disney Decides to Take Landay's Invention for Itself.**

25       19.   Instead of pursuing Landay's Pack 'N Wrap invention through Gem & I,

26  Disney decided to take the invention for itself and make its own Pack 'N Wrap products

27  without Gem & I's permission, without paying Gem & I and without informing Gem & I.

28  Gem & I did not know about this decision at the time and still does not know exactly when

**COMPLAINT**

Disney made this decision, but Gem & I is informed and believes that Disney decided to cut out Gem & I shortly after Landay's communications with Abraham in February 2006. Information supporting this belief includes (1) Disney developed and sold its own Pack 'N Wrap products without telling Landay and without including Gem & I or paying for the use of its invention, (2) the approved Disney vendors that Abraham had identified refused to communicate with Landay, (3) at least one other approved Disney vendor told Landay that Disney was preventing it from working with Gem & I, and (4) as the manufacturer for its own infringing products, Disney used one of the same vendors that refused to respond to Landay's calls and emails.

20.    Landay attempted to contact Idea Nuevo, FAB and Spin Master multiple times by telephone and email. Normally, such vendors would have been eager to pursue manufacturing of a product in which Disney was interested. But none of the three vendors returned Landay's calls or emails. Landay eventually succeeded in having one short conversation with a person from Idea Nuevo. During that conversation, Landay described the Pack 'N Wrap and said that she had been referred to Idea Nuevo by Deanne Abraham from Disney. The person from Idea Nuevo said that he would look into scheduling a meeting, but he never called Landay back. Landay's follow-up voicemails and emails also were not returned. Gem & I is informed and believes, and on that basis alleges, that the reason for this silence was that Disney had instructed Idea Nuevo and the other two vendors not to do business with Gem & I on Pack 'N Wrap products.

21.    Disney also prevented Gem & I from working with other Disney-approved vendors who wanted to partner with Gem & I on the Pack 'N Wrap. In March 2006, Landay and one of Gem & I's investors, Holleigh Schoors, went to New York to meet with two other Disney-approved vendors, Li & Fung and GDC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D. Li & Fung and GDC Love the Pack 'N Wrap, but Disney Prevents Them from Dealing with Gem & I.**

**1. Disney uses its power as Li & Fung's "boss" to compel it not to deal with Gem & I.**

22.    Both Li & Fung and GDC told Landay and Schoors that they loved the Pack 'N Wrap. At Li & Fung's offices in New York, Landay and Schoors met with George Vorkas, a Vice President of Li & Fung. Vorkas told them that he loved the Pack 'N Wrap and wanted Li & Fung to partner with Gem & I on the product. Landay and Vorkas discussed an arrangement for Gem & I to license the Pack 'N Wrap to Li & Fung, which could then fulfill orders for Disney and other large companies like Disney.

23.    On information and belief, even though Li & Fung wanted to work with Gem & I, Disney prevented it from doing so. In an email dated March 21, 2006, Vorkas told Landay: "We happen to love it." However, in the same email, Vorkas informed Landay that Li & Fung was not going to work with Gem & I on the Pack 'N Wrap, primarily because of a conversation Vorkas had had with Deanne Abraham from Disney.

24.    Landay responded to Vorkas, expressing her disappointment. Vorkas replied, making it clear that Disney did not want Li & Fung doing a deal with Gem & I and that Li & Fung had to obey Disney, regardless of Li & Fung's own preferences. Vorkas wrote: "Again, we are sorry. However, we do respect our licensors wishes as they are our 'boss' in a way."

**2. Disney causes GDC to breach its agreement with Gem & I.**

25.    In May 2006, Landay and another Gem & I investor, Ray Schoors, returned to New York to meet with GDC. They met with Dan Sabbah (President of GDC), Cory Waisner (GDC's Executive Vice President of Sales) and Felice Stolzberg (GDC's Vice President of Licensing) at GDC's offices in New York City. Sabbah was very enthusiastic about the Pack 'N Wrap and said he wanted to work with Gem & I on taking the product to the mass market. He also was interested in Gem & I's other products.

6

**COMPLAINT**

1    26.    On June 19, 2006, Gem & I and GDC entered into a written Letter of Intent.

2  A copy of the LOI is attached as Exhibit B.  The LOI specified that GDC intended to enter

3  into a definitive written licensing agreement, under which Gem & I would license the Pack

4  'N Wrap and other products to GDC.

5    27.    The LOI further stated that GDC would "use its best efforts to expand the sale

6  of the products, to obtain licenses from its various licensors (such as Disney, Nickelodeon

7  and Barbie) for use with the Products and to otherwise use all of its resources to promote

8  the sale of the Products through its current channels of distribution."

9    28.    The LOI stated that the parties would negotiate in good faith a definitive

10  written licensing agreement within 90 days of entering the LOI:  "GDC and Gem will

11  negotiate in good faith, for the purpose of executing and delivering within ninety (90) days

12  from the date hereof, a definitive written agreement with respect to the licensing of the

13  Products (the 'Agreement'), a draft of which shall be prepared by GDC's counsel promptly

14  following the execution of this Letter of Intent."

15    29.    In August 2006, Gem & I displayed the Pack 'N Wrap at a trade show in Utah.

16  During the trade show, buyers from Target Sourcing Services – the buying arm of the large

17  Target store chain – approached Gem & I about the Pack 'N Wrap.  The Target buyers told

18  Landay that they were very interested, and they asked Landay send them a sample Pack 'N

19  Wrap.  Landay sent the sample to Target.  Gem & I also was approached by several other

20  interested buyers at the trade show.  Landay informed GDC about the interest of Target and

21  other buyers.

22    30.    On information and belief, even though GDC wanted to work with Gem & I,

23  Disney prevented it from doing so – as it had prevented Li & Fung – because Disney was

24  planning to sell its own girls' and boys' sleepover packs and exclude Gem & I from the

25  project.

26    31.    GDC never sent Gem & I a written licensing agreement as promised.  Between

27  October 2006 and December 2006, Landay repeatedly reminded GDC that potential buyers

28  were waiting and that Gem & I needed the licensing agreement promised under the LOI,

7

**COMPLAINT**

1 which was overdue. In December 2006, Gem & I sent GDC a draft licensing agreement.

2 GDC did not sign that agreement, and did not propose its own. On information and belief,

3 the reason for GDC's silence and sudden loss of interest was the same reason why Li &

4 Fung felt unable to work with Gem & I: Disney used its power as GDC's "boss" to prevent

5 it from going forward with Gem & I.

6   **E. Disney Sells Infringing Pack 'N Wrap Products.**

7   32. Without any notice to Gem & I, Disney appropriated Landay's Pack 'N Wrap

8 invention and directly arranged for the manufacture of Pack 'N Wrap products without

9 including or paying Gem & I. After successfully obstructing Gem & I's efforts to sell the

10 Pack 'N Wrap, Disney began selling its own infringing girls' and boys' sleepover packs,

11 including a sleepover pack known as "Plush Throw with Travel Wrap" and "Throw Wrap."

12 Disney's customers for these infringing products include the Target chain – one of the same

13 potential customers that had expressed interest to Landay.

14   33. As far as Gen & I knows, Target's first sales of Disney's infringing product

15 were in 2008. Disney's 2008 sleepover pack was decorated with character art from the

16 Disney production "Camp Rock." The consumer label for the Disney sleepover pack

17 identifies Fashion Accessory Bazaar (FAB) as the manufacturer – the same company that

18 refused to return Landay's calls and emails.

19   34. The next year, 2009, Target sold three versions of Disney's infringing

20 sleepover packs, with character art from "Camp Rock" and two other Disney productions,

21 "Hannah Montana" and "High School Musical."

22   **F. Juicy Couture Sells Infringing Products.**

23   35. Disney turned out not to be the only major company that liked and

24 misappropriated Landay's Pack 'N Wrap invention. On information and belief, Juicy

25 Couture decided to have the same manufacturer that made the Pack 'N Wrap for Gem & I –

26 Sun XinFa – produce a copy of the Pack 'N Wrap for Juicy Couture.

27   36. Juicy Couture started selling its own girls' and boys' sleepover packs in 2008.

28 These packs are known as "Juicy Couture Sleeping Bag." Juicy Couture sold its sleepover

1   pack to store chains including Neiman Marcus and SAKS 5th Avenue and directly to

2   consumers on the Juicy Couture website.

3       37.    The manufacturer's label affixed to the Juicy Couture sleepover pack states

4   that the item was produced by Sun XinFa.

5   **G. Gem & I Is Driven Out of Business**

6       38.    Gem & I did not discover that Disney was developing, planning to sell, or

7   selling a girls' and boys' sleepover pack until Landay's sister-in-law saw one of Disney's

8   "Camp Rock" packs while shopping in Target on July 26, 2008.  Landay discovered the

9   Juicy Couture Sleeping Bag two weeks earlier.

10       39.    Only after learning that Disney had knocked-off the Pack 'N Wrap and

11   launched its own girls' and boys' sleepover pack did Gem & I realize that Disney had been

12   responsible for thwarting Gem & I's efforts to do business with all of the Disney-approved

13   vendors – or why Disney was motivated to do so.  With infringing products from Disney

14   and Juicy Couture already on the market, the Landays had no choice but to shut down Gem

15   & I's manufacturing, marketing, and sales activities.  Gem & I lost a promising and

16   lucrative business as a result.

17

18                     **FIRST CLAIM FOR RELIEF**

19            **(Against Disney for Breach of Implied Contract)**

20       40.    Gem & I re-alleges and incorporates here by reference the allegations in

21   Paragraphs 1 through 39.

22       41.    Landay contacted Disney to pitch her Pack 'N Wrap invention as a product for

23   sale by Disney to large retailers and possibly other customers.  Landay was put in touch

24   with Deanne Abraham at Disney, who confirmed Disney's interest in partnering with Gem

25   & I on the Pack 'N Wrap.

26       42.    Based upon Abraham's assurances and representations of Disney's interest in

27   partnering with Gem & I on the Pack 'N Wrap, Landay disclosed Gem & I's plans,

28

9

**COMPLAINT**

1 | materials and information about the Pack 'N Wrap to Disney, including a sample of the

2 | product.

3 |      43.    Gem & I and Disney engaged in this exchange of materials and information

4 | with the bilateral expectation, fully and completely understood, that if Disney pursued the

5 | Pack 'N Wrap, Gem & I would be included in the project and would be fairly compensated

6 | for the reasonable value of its contribution.

7 |      44.    Gem & I justifiably expected that Disney would not pursue the Pack 'N Wrap

8 | without permission from Gem & I, and furthermore, justifiably expected to be included in

9 | the pursuit of any such product and fairly compensated for the reasonable value of Gem &

10 | I's contribution.

11 |      45.    Disney breached this implied agreement when it took, copied, and exploited

12 | Gem & I's invention, products, and ideas for its own use without Gem & I's consent, and

13 | failed to provide Gem & I with the benefits of the valuable matters taken by Disney.

14 |      46.    As a proximate result of Disney's breach, Gem & I has lost royalties and

15 | profits on Pack 'N Wrap products and other Gem & I products, and suffered other

16 | damages, in an amount to be proven at trial.

17 |

18 | **SECOND CLAIM FOR RELIEF**

19 | **(Against Disney for Fraud)**

20 |      47.    Gem & I re-alleges and incorporates here by reference the allegations in

21 | Paragraphs 1 through 46.

22 |      48.    Despite assuring Gem & I that Disney wanted to partner with Gem & I on the

23 | Pack 'N Wrap, and despite representing that Gem & I should accordingly pursue

24 | agreements with approved Disney manufacturers, Disney secretly decided to take Gem &

25 | I's invention, products, and ideas for its own use, without Gem & I's participation or

26 | consent, and to pay Gem & I nothing. Disney fraudulently concealed its true intentions and

27 | plans from Gem & I, knowing full well that Gem & I believed it would be partnering with

28 | Disney, that Gem & I was expending resources on pursuing Disney-approved vendors, and

**COMPLAINT**

1 that Gem & I believed Disney would not pursue the Pack 'N Wrap without partnering with
2 and compensating Gem & I.

3     49.    On information and belief, Disney purposefully concealed its true intentions
4 and plans in order to prevent Gem & I from taking timely and effective legal action, to
5 distract Gem & I and encourage it to spend time and resources pursuing partnerships with
6 Disney-approved vendors that Disney would never allow to come to fruition, and to beat
7 Gem & I to the mass market with a girls' and boys' sleepover pack that was solely owned
8 and controlled by Disney.

9     50.    Gem & I reasonably and justifiably relied on its agreement with Disney,
10 Disney's representations of interest in partnering with Gem & I, and Disney's concealment
11 of its intentions to take Gem & I's invention, products, and ideas for its own use, without
12 Gem & I's participation or consent, and to pay Gem & I nothing. As a result, Gem & I
13 reasonably spent time and resources pursuing partnerships with Disney-approved vendors,
14 and Gem & I refrained from pursuing legal action to protect its rights against Disney.

15     51.    As a result of Disney's fraudulent concealment, by the time Gem & I finally
16 discovered that Disney had pursued sales of its own girls' and boys' sleepover pack in
17 2008, Gem & I was no longer in a position to take effective legal action to protect its
18 business and had no choice but to shut down its manufacturing, marketing, and sales
19 activities. Had Disney disclosed its true intentions and plans before Disney's product hit
20 the market, Gem & I could have and would have pursued legal action, including injunctive
21 relief, to stop Disney from going forward with sales of its girls' and boys' sleepover pack.

22     52.    As a proximate result of Disney's fraud and concealment, Gem & I has lost
23 royalties and profits on Pack 'N Wrap products and other Gem & I products, and suffered
24 other damages, in an amount to be proven at trial.

25     53.    Disney's fraud and concealment were oppressive, fraudulent, and malicious,
26 and Gem & I is entitled to exemplary and punitive damages under California Civil Code §
27 3294.

28

## THIRD CLAIM FOR RELIEF

### (Against Disney for Intentional Interference with Contract)

54.     Gem & I re-alleges and incorporates here by reference the allegations in Paragraphs 1 through 53.

55.     Gem & I had a contractual relationship with GDC, with the probability of future economic benefit to Gem & I.  This contractual relationship included the written letter of intent signed by both GDC and Gem & I (Exhibit B).

56.     The LOI specified that GDC intended to enter into a definitive written licensing agreement, under which Gem & I would license the Pack 'N Wrap and other products to GDC.

57.     The LOI further stated that GDC would "use its best efforts to expand the sale of the products, to obtain licenses from its various licensors (such as Disney, Nickelodeon and Barbie) for use with the Products and to otherwise use all of its resources to promote the sale of the Products through its current channels of distribution."

58.     In the LOI, GDC and Gem & I agreed to negotiate in good faith a definitive written licensing agreement within 90 days of entering the LOI.

59.     Disney knew of the relationship between Gem & I and GDC.

60.     On information and belief, Disney intentionally interfered in the relationship between Gem & I and GDC by preventing it from fulfilling its obligations under the LOI, exercising the power Disney had over GDC and directing it not to do business with Gem & I, even though GDC was contractually obligated to negotiate a licensing agreement with Gem & I in good faith.

61.     As a result of Disney's interference, the contractual relationship between Gem & I and GDC was disrupted.  GDC ceased to perform its obligations under the LOI, with the result that Gem & I never entered into a licensing agreement with GDC and GDC never manufactured Pack 'N Wraps in partnership with Gem & I.

62.     As a result of Disney's interference, Gem & I lost opportunities that would have allowed the Pack 'N Wrap to realize the kind of success that Disney experienced with

12

**COMPLAINT**

1 | its girls' and boys' sleepover packs. Disney's interference proximately caused Gem & I to

2 | lose royalties and sales on Pack 'N Wraps and on other Gem & I products, in an amount to

3 | be proven at trial. Disney's interference also was the proximate cause of Gem & I's demise

4 | as a business and the Landays' loss of the life savings they had invested.

5 |     63.    Disney's interference was oppressive, fraudulent, and malicious, and Gem & I

6 | is entitled to exemplary and punitive damages under California Civil Code § 3294.

7

8 | **FOURTH CLAIM FOR RELIEF**

9 | **(Against Disney for Intentional Interference**

10 | **with Prospective Economic Advantage)**

11 |     64.    Gem & I re-alleges and incorporates here by reference the allegations in

12 | Paragraphs 1 through 63.

13 |     65.    Gem & I had economic relationships with both Li & Fung and GDC, with the

14 | probability of future economic benefits to Gem & I.

15 |     66.    Disney knew of Gem & I's relationships with Li & Fung and GDC. Both Li

16 | & Fung and GDC spoke with Disney about their interest in Gem & I's Pack 'N Wrap.

17 |     67.    On information and belief, Disney intentionally interfered in Gem & I's

18 | relationships with Li & Fung and GDC by exercising the power Disney had over Li &

19 | Fung and GDC and directing them not to do business with Gem & I, even though both Li &

20 | Fung and GDC wanted to license the Pack 'N Wrap from Gem & I.

21 |     68.    As a result of Disney's interference, the relationships between Gem & I and Li

22 | & Fung and between Gem & I and GDC were disrupted. GDC ceased to perform its

23 | obligations under the LOI, with the result that Gem & I never entered into a licensing

24 | agreement with GDC and GDC never manufactured Pack 'N Wraps in partnership with

25 | Gem & I. Li & Fung also declined to go forward with Gem & I as a result of Disney's

26 | interference, so it too never manufactured Pack 'N Wraps in partnership with Gem & I.

27 |     69.    As a result of Disney's interference, Gem & I lost opportunities that would

28 | have allowed the Pack 'N Wrap to realize the kind of success that Disney experienced with

13

**COMPLAINT**

1  its girls' and boys' sleepover packs. Disney's interference proximately caused Gem & I to
2  lose royalties and sales on Pack 'N Wraps and on other Gem & I products, in an amount to
3  be proven at trial. Disney's interference also was the proximate cause of Gem & I's demise
4  as a business and the Landays' loss of the life savings they had invested.

5      70.    Disney's interference was wrongful, even apart from its interfering character,
6  because it involved fraudulent concealment, idea misappropriation in breach of an implied
7  contract, anticompetitive conduct, and patent infringement.

8      71.    Disney's interference was oppressive, fraudulent, and malicious, and Gem & I
9  is entitled to exemplary and punitive damages under California Civil Code § 3294.

10

11  **FIFTH CLAIM FOR RELIEF**

12  **(Against GDC for Breach of Written Contract)**

13      72.    Gem & I re-alleges and incorporates here by reference the allegations in
14  Paragraphs 1 through 71.

15      73.    Gem & I and GDC entered into a binding contract in the form of a written
16  letter of intent signed by both parties (Exhibit B).

17      74.    In the LOI, GDC promised to negotiate in good faith with Gem & I over a
18  definitive written licensing agreement for the Pack 'N Wrap and other Gem & I products.
19  GDC also promised to have its counsel promptly prepare a draft license agreement.

20      75.    The LOI further required GDC to use its best efforts to expand the sale of the
21  Pack 'N Wrap and other Gem & I products, to obtain licenses from GDC's various
22  licensors and to otherwise use all of its resources to promote the sale of the Pack 'N Wrap
23  and other Gem & I products through GDC's current channels of distribution.

24      76.    GDC breached its agreement by failing to negotiate in good faith with Gem &
25  I over a definitive written licensing agreement for the Pack 'N Wrap and other Gem & I
26  products and by failing to even present a draft of such a licensing agreement. Instead of
27  negotiating in good faith, GDC abandoned any effort to fulfill its obligations under the LOI
28  or to arrive at a licensing agreement with Gem & I. On information and belief, GDC

**COMPLAINT**

1  acquiesced to demands by Disney that GDC not do business with Gem & I, while Disney

2  developed its own girls' and boy's sleepover pack.

3       77.    GDC also breached its agreement by failing to use its best efforts to expand

4  the sale of the Pack 'N Wrap and other Gem & I products, to obtain licenses from GDC's

5  various licensors and to otherwise use all of its resources to promote the sale of the Pack 'N

6  Wrap and other Gem & I products through GDC's current channels of distribution.

7       78.    As a result of GDC's breaches, Gem & I lost opportunities that would have

8  allowed the Pack 'N Wrap to realize the kind of success that Disney experienced with its

9  girls' and boys' sleepover pack.  GDC's breach proximately caused Gem & I to lose

10 royalties and sales on Pack 'N Wraps and on other Gem & I products, in an amount to be

11 proven at trial.  GDC's breach also was the proximate cause of Gem & I's demise as a

12 business and the Landays' loss of the life savings they had invested.

13

14                     **SIXTH CLAIM FOR RELIEF**

15                **(Against Disney for Patent Infringement)**

16      79.    Gem & I re-alleges and incorporates here by reference the allegations in

17 Paragraphs 1 through 78.

18      80.    On February 6, 2007, the United States Patent and Trademark Office issued

19 United States Patent Number 7,171,707, entitled "Portable Rollup Pack," naming Lisa A.

20 Landay as inventor.  A true and correct copy of the '707 Patent is attached as Exhibit A to

21 this Complaint.

22      81.    Gem & I owns all right, title, and interest in and to the '707 Patent and has full

23 and exclusive rights to enforce the patent, including the right to recover for past

24 infringement.

25      82.    Disney has infringed the '707 Patent by making or having made, using,

26 selling, offering for sale, and importing its "Plush Throw with Travel Wrap," also known as

27 a "Throw Wrap."  These infringing products have included, without limitation, ones with

28

                          15
                     **COMPLAINT**

1    markings and decorations from the Disney productions "Camp Rock," "Hannah Montana,"

2    and "High School Musical."

3         83.    Gem & I has suffered lost profits as a direct and proximate result of the

4    infringement of the '707 Patent by Disney.  In addition, or in the alternative, Gem & I is

5    entitled to reasonable royalties for the infringement of the '707 Patent by Disney.

6         84.    The Court should enjoin further infringement by Disney and by anyone acting

7    on its behalf or in concert with it.  On information and belief, absent such an injunction,

8    Disney will continue infringement and Gem & I will suffer irreparable injury, for which it

9    has no adequate remedy at law.

10        85.    On information and belief, Disney's infringement has been and is willful or, in

11   the alternative, any continued infringement by Disney after service of this complaint will be

12   willful, justifying awards of enhanced damages and attorneys' fees.

13

14                          **SEVENTH CLAIM FOR RELIEF**

15                  **(Against Juicy Couture for Patent Infringement)**

16        86.    Gem & I re-alleges and incorporates here by reference the allegations in

17   Paragraphs 1 through 85.

18        87.    Juicy Couture has infringed the '707 Patent by making or having made, using,

19   selling, offering for sale, and importing its "Juicy Couture Sleeping Bag."

20        88.    Gem & I has suffered lost profits as a direct and proximate result of Juicy

21   Couture's infringement of the '707 Patent.  In addition, or in the alternative, Gem & I is

22   entitled to reasonable royalties for Juicy Couture's infringement of the '707 Patent.

23        89.    The Court should enjoin further infringement by Juicy Couture and by anyone

24   acting on its behalf or in concert with it.  On information and belief, absent such an

25   injunction, Juicy Couture will continue infringement and Gem & I will suffer irreparable

26   injury, for which it has no adequate remedy at law.

27

28

                                     16
                               **COMPLAINT**

90.     On information and belief, Juicy Couture's infringement has been and is willful or, in the alternative, any continued infringement by Juicy Couture after service of this complaint will be willful, justifying awards of enhanced damages and attorneys' fees.

## PRAYER FOR RELIEF

Gem & I requests judgment as follows:

**A. AGAINST DISNEY ON THE FIRST CLAIM FOR RELIEF (BREACH OF IMPLIED CONTRACT):**

1.     For actual damages resulting from Disney's breach of the implied contract with Gem & I;

2.     For costs of suit; and

3.     For any other appropriate relief.


**B. AGAINST DISNEY ON THE SECOND CLAIM FOR RELIEF (FRAUD):**

1.  For actual damages resulting from Disney's fraud;

2.  For punitive damages under California Civil Code § 3294;

3.  For costs of suit; and

4.  For any other appropriate relief.


**C. AGAINST DISNEY ON THE THIRD CLAIM FOR RELIEF (INTENTIONAL INTERFERENCE WITH CONTRACT):**

1.  For actual damages resulting from Disney's intentional interference with the contract between Gem & I and GDC;

2.  For punitive damages under California Civil Code § 3294;

3.  For costs of suit; and

4.  For any other appropriate relief.

**COMPLAINT**

### D. **AGAINST DISNEY ON THE FOURTH CLAIM FOR RELIEF (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE):**

1. For actual damages resulting from Disney's intentional interference with Gem & I's prospective economic advantage;

2. For punitive damages under California Civil Code § 3294;

3. For costs of suit; and

4. For any other appropriate relief.

### E. **AGAINST GDC ON THE FIFTH CLAIM FOR RELIEF (BREACH OF WRITTEN CONTRACT):**

1. For actual damages resulting from GDC breach of the letter of intent;

2. For costs of suit; and

3. For any other appropriate relief.

### F. **AGAINST DISNEY AND JUICY COUTURE ON THE SIXTH AND SEVENTH CLAIMS FOR RELIEF (PATENT INFRINGEMENT):**

1. For judgment that Disney and Juicy Couture have infringed the '707 Patent;

2. For damages resulting from Disney's and Juicy Couture's infringement of the '707 Patent, including Gem & I's lost profits and in no event less than a reasonable royalty;

3. For a finding that Disney's and Juicy Couture's infringement of the '707 Patent has been willful and for treble damages under 35 U.S.C. § 284;

4. For a finding that this is an exceptional case and an award of attorneys' fees under 35 U.S.C. § 285;

5. For preliminary and permanent injunctions against further infringement of the '707 Patent by Disney and Juicy Couture, their its officers, agents, and employees, and everyone acting on their behalf or in concert with them;

6. For costs of suit;

18

**COMPLAINT**

1    7.  For prejudgment and post-judgment interest; and

2    8.  For any other appropriate relief.

3

4  Dated:  July 12, 2010

5                                WILLIAM J. O'BRIEN
                                 MARC S. WILLIAMS
6                                JOSEPH K. LIU
7                                **ONE LLP**

8

9

10

11

12                           By: _____
13                               Marc S. Williams
                                 Attorneys for Plaintiff,
14                               Gem & I Products, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

19
**COMPLAINT**

## DEMAND FOR JURY TRIAL

Plaintiff, Gem & I Products, Inc., hereby demands trial by jury of all issues so triable under the law.

Dated:  July 12, 2010

WILLIAM J. O'BRIEN
MARC S. WILLIAMS
JOSEPH K. LIU
**ONE LLP**

By: _____
    Marc S. Williams
    Attorneys for Plaintiff,
    Gem & I Products, Inc.

**COMPLAINT**

US007171707B2

(12) **United States Patent**

Landay

(10) Patent No.: **US 7,171,707 B2**

(45) Date of Patent: **Feb. 6, 2007**

(54) **PORTABLE ROLLUP PACK**

(75) Inventor: **Lisa A. Landay**, San Clemente, CA (US)

(73) Assignee: **Gem & I Products, Inc.**, San Clemente, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/134,962**

(22) Filed: **May 23, 2005**

(65) **Prior Publication Data**

US 2006/0260046 A1      Nov. 23, 2006

(51) **Int. Cl.**
*A47G 9/08* (2006.01)
*B65D 30/00* (2006.01)
*B65D 33/00* (2006.01)

(52) **U.S. Cl.** ............................ 5/413 R; 383/4; 383/16; 383/39; 383/106; 190/2; 224/156

(58) **Field of Classification Search** ................ 5/413 R, 5/413 AM, 417–420; 383/4, 39, 106, 16; 224/156, 153; 190/1, 2
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,269,276 A | * | 6/1918 | Harris | ........................... 383/4 |
| 2,679,877 A | * | 6/1954 | Leggett | ...................... 383/39 |
| 4,562,952 A | * | 1/1986 | Chinman | ................ 229/87.15 |
| 4,587,682 A | * | 5/1986 | Schultz | ...................... 5/413 R |
| D289,228 S | * | 4/1987 | Chinman | ................. D3/299 |
| 4,881,684 A | * | 11/1989 | Chinman | .................. 190/115 |
| 4,967,986 A | * | 11/1990 | Schildkraut | ............. 224/250 |
| 5,287,571 A | * | 2/1994 | Rademacher | ............. 5/413 R |
| 5,622,300 A | | 4/1997 | Robinson | |
| 5,743,649 A | * | 4/1998 | Gonzalez | ....................... 383/6 |
| 6,061,849 A | * | 5/2000 | Seals | ............................ 5/417 |
| 6,193,034 B1 | * | 2/2001 | Fournier | .................. 190/107 |
| 6,543,072 B2 | | 4/2003 | Hsu | |
| 7,028,870 B2 | * | 4/2006 | Valdez-Campbell | ........ 224/153 |

* cited by examiner

*Primary Examiner*—Alexander Grosz
(74) *Attorney, Agent, or Firm*—Advantage IP Law Firm

(57) **ABSTRACT**

A portable rollup pack for organizing, storing, and transporting personal articles including a sleeping bag for an extended stay is provided in an elongated bag body having a central carrying section and laterally positioned flexible wing wraps with the body having a compartmentalized interior surface region and an exterior surface with fasteners and carrying handles such that the bag body may receive personal articles in the compartmentalized region and then be wrapped about a cylindrically shaped sleeping bag and transported as an integral unit.

**19 Claims, 5 Drawing Sheets**





Case 8:10-cv-01051-AG -RNB   Document 1   Filed 07/12/10   Page 23 of 39   Page ID #:24



Fig. 1

U.S. Patent          Feb. 6, 2007          Sheet 2 of 5          US 7,171,707 B2



Fig. 2



12

Fig. 3



Fig. 4



Fig. 5A

Fig. 5B

Fig. 5C

US 7,171,707 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# PORTABLE ROLLUP PACK

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to an apparatus for transporting personal articles and more specifically to carry packs for organizing, storing, and transporting substantially flattened or compressible articles along with rolled up cushioning articles such as sleeping gear, exercise and seating mats, towels and other rolled up articles.

2. General Background and State of the Art:

Adults as well as children often engage in overnight camping trips as well as slumber parties. For such extended stays, the overnighter generally must pack both a sleeping bag and a personal carrying pack. Typically, any personal items are stored in a carrying pack such as a school backpack or knapsack that is transported on the individual's back or hand-carried. The sleeping bag is also generally rolled up into a bulky cylindrical package and lugged under one arm or otherwise carried by a handle. Thus, even with the carrying pack worn on the back, this transportation method occupies at least one arm and takes up a significant amount of space. While the size of some backpacks allows the user to compress the sleeping bag into the bottom of the pack, this is not practical for many of the larger, less compressible sleeping bags commonly used on overnight trips. In addition, the sleeping bag is typically stored at the bottom of the pack and is not readily accessible without removing the entire contents of the pack.

In U.S. Pat. No. 6,543,072 to Hsu an integrated knapsack and sleeping bag combination is described in an attempt to reduce some of this transportation concern. However, the sleeping bag in this combination is connected to the lining of the knapsack and thus does not facilitate cleaning the sleeping bag or replacing the sleeping bag once it is outgrown or degrades so as to be no longer useful.

Another solution for carrying personal items is described in U.S. Pat. No. 5,622,300 to Robinson. This patent describes a roll pack for transporting articles to the beach or a picnic area. The roll pack described in this patent describes a set of pockets along one edge for storing articles including a pillow and a set of pockets along the opposite edge for storing a set of tie wraps so as to prevent the hook and loop fasteners from becoming fouled with dirt or other contaminants. The majority of the roll pack is taken up by a large intermediate section made up of an absorbent material such as terry cloth. This central enlarged section is provided for use as a towel so that the user does not need to bring a separate towel. By providing such a large towel section, this roll pack configuration wastes a considerable amount of useable storage space. Moreover, it would be impractical to store articles up against the wet towel section as such articles could absorb the towel moisture and become damaged.

Thus, there exists a need for rollup pack for maximizing storage space while transporting a rolled up article such as a sleeping bag in a manner so as to free the user's hands during transportation.

## INVENTION SUMMARY

In accordance with a preferred embodiment of the present invention, a rollup pack for organizing, storing and transporting articles for extended stays and for use with a cushioning object such as a sleeping bag rolled up into a cylindrical configuration is provided in an elongated bag body with exterior and interior surfaces and a central carrying section disposed between two flexible laterally disposed wings that may include a pair of complementary fastener elements for releasably securing the wings about the rolled up sleeping bag. The interior surface of the bag body may include a plurality of pockets that may span a substantial length of the bag body and are placed against the sleeping bag when the rollup pack is secured about the sleeping bag. A pair of carrying straps facilitates transporting the rollup pack and sleeping bag together as single unit as a backpack thus freeing the user's hands during transport.

In another aspect of the present invention, the pockets span a substantial length of the bag body and may include fold wells between pockets to accommodate folding the bag body about the sleeping bag.

Another feature of the present invention is the provision of a waterproof interior surface or pocket and a viewing window to ascertain contents of the pocket without having to completely empty the pocket.

Yet another feature of the present invention is the incorporation of pocket opening parallel to the side edges of the bag body and facing inwardly to reduce the likelihood of inadvertent removal or spilling out of the pocket.

Other aspects of the present invention will become apparent with further reference to the following drawings and specification.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an elevational view of an interior surface of a rollup pack in accordance with one embodiment of the present invention;

FIG. 2 is a reverse elevational view of an exterior surface of the rollup pack of FIG. 1;

FIG. 3 a top view of an unrolled, partially open, conventional sleeping bag for use with the rollup pack of FIG. 1;

FIG. 4 is an elevational view illustrating various articles being stored within the pockets of the rollup pack of FIG. 1; and

FIGS. 5A–5C is a set of perspective views illustrating the packing of the sleeping bag and rollup pack of FIG. 1 to prepare for their transport as an integrated unit.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now to FIGS. 1–2 illustrating interior and exterior views of an exemplary portable rollup pack in accordance with the present invention and generally designated 10, the rollup pack is provided for organizing, storing, and transporting personal articles, items, or objects including a rolled up sleeping bag for extended stays. An exemplary sleeping bag, generally designated 12, is illustrated in FIG. 3. When laid flat as in FIGS. 1–2, the rollup pack 10 generally includes a substantially rectangular bag body 14 that may be divided generally into a medial carrying section 16 interposed between a left lateral wing wrap 18 and a right lateral wing wrap 20. The bag body is constructed of an outer layer of fabric 22 sewn to a similarly dimensioned inner layer of fabric 24 forming an exterior bag body surface 26 and interior bag body surface 28, respectively. The top edge 21, bottom edge 23, left hand edge 25, and right hand edge 27 of the bag body are then finished off with conventional ¼ inch filled piping 30 circumscribing the perimeter of the bag body. In this exemplary embodiment, the overall

US 7,171,707 B2

3

height of the bag body measured from the top edge 21 to the bottom edge 23 is approximately 12.5 inches and the overall length is approximately 45 inches measured from the left hand edge 25 to the right hand edge 27 as viewed in FIG. 1.

With continued reference to FIG. 1, the interior surface 28 of the bag body 14 may be divided into a number of pockets for organizing, storing, and transporting personal articles. In this exemplary embodiment, the bag body includes six pockets arranged across substantially the entire length and height of the bag body as viewed in FIG. 1. The leftmost upper pocket 31 and lower pocket 32 are vertically stacked and span the entire height of the bag body. In this exemplary embodiment, these dual pockets subdivide the height of the bag body equally. These dual pockets include a common bottom edge 34 that corresponds with the leftmost edge 25 of the bag body as viewed in FIG. 1. The dual pockets also share a common sidewall 35. Each pocket 31, 32 includes a vertically projecting top edge 36, 38, respectively, forming an opening into the respective pocket. The openings face the right hand end 27 of the bag away from the left hand edge 25. The top edges of the pockets 31, 32 may be lined with a conventional hook and loop type closure as indicated by strips 37, 39, respectively, to seal off the contents of the pocket. A convenient pull tab 40, 42 is provided on each pocket 31, 32, respectively, to facilitate separating the hook section from the loop section to gain access to the pocket.

These dual pockets 31 and 32 are typically dimensioned to accommodate smaller personal articles. In this exemplary embodiment, these pockets measure approximately 7.5 inches in depth from the bottom edge 34 of each pocket to the top open edge 36 or 38, respectively. Depth is generally defined as the distance from the bottom edge of a pocket to a top open edge of a pocket. To the immediate right of the dual pockets 31 and 32, a first enlarged pocket 44 is provided. The bottom edge 46 of this pocket is located proximate the openings of the dual pockets 31 and 32. This enlarged pocket 44 spans the entire height of the bag body 14 and measures approximately 14 inches in depth. As with the dual pockets, the first enlarged pocket is provided with a top edge 48 providing an opening facing the right hand end 27 of the bag body 14. A closure device in the form of a nylon zipper 50 may be used to seal off this pocket.

With continued reference to FIG. 1, spaced to the right of the first enlarged pocket 44 is a pair of intermediate pockets 52 and 54. These pockets are constructed identically and each measure about 4.75 inches in depth and span the entire height of the bag body 14. The bottom edge 56 of the first intermediate pocket 52 is conjoined with the top edge of the zipper closure 50. The top edge 58 of the first intermediate pocket faces the right hand end 27 of the bag body. The second intermediate pocket 54 includes a bottom edge 60 spaced to the right of the top edge of the first intermediate pocket and an opening 62 that faces the right hand edge of the bag body as well. In this example, each of the intermediate pockets 52, 54 incorporate hook and loop closures as indicated by strips 53, 55, respectively, to seal off their respective contents. As with the dual pockets 31, 32, each intermediate pocket includes a pull tab 63, 65 respectively to assist in separating the hook and loop closures lining the opening of the intermediate pockets.

Still referring to FIG. 1, the rightmost pocket 64 is a second enlarged pocket and includes a bottom edge 66 corresponding with the right hand edge 27 of the bag body 14. Unlike the other pockets, the top opening 68 of this pocket faces to the left hand side 25 of the bag body, as viewed in FIG. 1. The second enlarged pocket includes a zipper closure 70 for controlling access to the pocket com-

4

partment. The second enlarged pocket 64 also spans the entire height of the bag body and measure approximately 11 inches in depth in this exemplary pocket configuration.

The pockets 31, 32, 44, 52, 54, and 64 may be formed by sewing, adhering, welding or using other suitable joining techniques to join the three sides of a substantially rectangular plastic sheet or sheets to the interior surface 28 of the bag body 14. As described above, a fourth edge of the plastic sheet forms an opening into the respective pocket compartments that may be closed using conventional closure devices such as plastic or metal zippers, hook and loop closures, buttons, snaps, and other suitable closure device. It is not necessary to use a closure device however. It is preferable to use clear plastic sheets to form a viewing window, such as exemplified by reference numeral 72 (FIG. 4), so that the contents of the pocket may be easily ascertained without having to open the pocket and remove the contents one at a time until the desired article is retrieved. Other suitable materials may be used as well and the viewing window may comprise the entire pocket wall or a portion thereof. To maximize the storage capacity of the bag body, it is also preferable to provide pockets across the entire width and height of the bag body 14. However, other pocket configurations will occur to one of ordinary skill in the art. In this example, all of the pocket openings are configured substantially parallel to the left and right hand edges 25, 27, respectively, of the bag body.

The pockets may be spaced apart from one another to accommodate folding of the bag body 14 as well. For instance, there are three folding wells in this exemplary bag body 14 as illustrated in FIG. 1. The first or leftmost folding well 74 is spaced between the top edges 36, 38 of the dual pockets 31, 32, respectively, and the bottom edge 46 of the first enlarged pocket 44. An intermediate folding well 76 is interposed between the top edge 58 of the first intermediate pocket 52 and the bottom edge 60 of the second intermediate pocket 54. The rightmost or third folding well 78 is positioned between the opening 62 of the second intermediate pocket 54 and the zipper closure 70 of the second enlarged pocket 64. In this example, these wells span the entire height of the bag body and measure about 1.5 inches across. These wells provide fold lines that accommodate folding the bag body even when the individual pockets are relatively full and may resist folding themselves.

It is also preferable to construct the bag body 14 from waterproof materials or at least highly water resistant materials such as nylon, polyester, or other suitable material. As an alternative, the materials or fabrics used to construct the bag body may be treated with a waterproofing substance. This prevents personal articles that may leak from spreading to the remainder of the bag body or sleeping bag 12 when the rollup pack is in contact with the bag. In addition, a wet towel may be placed in one the pockets without concern of dampening the other articles or sleeping bag. By providing a waterproof exterior surface 26, the items in the pockets and sleeping bag are further protected from exterior moisture. In addition, if the contents of the bag body 14 are removed or there is no concern if they are compressed, the rollup pack may be used as a mat underneath the sleeping bag 12 when unrolled further protecting the sleeping bag and providing an insulating surface beneath the sleeping bag.

Referring now to FIG. 2, on the exterior surface 26 of the bag body 14 includes a pair of carrying handles 80 and 82. The ends of each carrying handle are sewn to the top edge 21 and bottom edge 23 of the bag body 14. These carrying handles are approximately 22 inches in length to provide ample length for use as shoulder straps in addition to be used

US 7,171,707 B2

5

as carrying handles. In this exemplary embodiment, the shoulder straps 80 and 82 are spaced approximately 8.75 inches from the respective left end 25 and right end 27 of the bag body 14. The handles may be adjustable using a conventional shoulder strap adjustment construction. The shoulder straps are preferably constructed of a webbed strapping and may be padded. In general, the shoulder straps divide the intermediate carrying section 16 from the lateral wings 18 and 20, respectively. However, this division is for ease of description and not meant to be limiting in any manner.

With continued reference to FIG. 2, a first pair of pack fasteners 84, 86 is sewn into the exterior surface 26 of the bag body 14. The pack fasteners 84 and 86 include a length of webbed strapping 85, 87, respectively, measuring approximately 10.75 inches in length from an interior end fastened to the exterior surface 26 within the intermediate carrying section 16 to the left hand edge 25 of the bag body 14. Each fastener 84, 86 projects approximately 1–2 inches beyond the left most edge 25 of the bag body and terminates in a plastic clip 88, 90, respectively, of the dual bayonet variety. The fasteners 84 and 86 are spaced apart approximately 6.5 inches along the height of the bag body. The strap portions 85 and 87 of the fasteners are constructed from a similar webbed strapping material as the shoulder straps 80 and 82.

With continued reference to FIG. 2, on the right hand side of the bag body 14 is a second pair of pack fasteners 92, 94 constructed in a similar manner to the first pair of pack fasteners 84, 86 with a strap section 93, 95, respectively, sewn into the exterior surface 26 of the bag body. The ends of the pack fasteners 92, 94 project approximately 1–2 inches beyond the right hand edge 27 of the bag body and terminate in a plastic buckle 96, 98, respectively, for fastening to the clips 88, 90 of the first pair of pack fasteners when the wings 18 and 20 are brought together. As viewed in FIG. 2, upper first fastener 84 is aligned with upper second fastener 92 along the height of the bag body when the bag body is rolled out flat. Lower first fastener 86 is aligned with lower second fastener 94 in a similar configuration. These fastener pairs may be adjustable as well to accommodate a variety of sleeping bag dimensions. This exemplary embodiment describes a two pair of pack fasteners in the form of a clip and buckle. It will be appreciated that other suitable releasable fastening devices may be used as well including hook and loop closures, snaps, buttons, rings, clamps, hooks and grommets, or loose tie ends.

With reference now to FIGS. 1–4, in use, the rollup pack 10 is laid out flat on a bed or other convenient flat surface. The user may then grasp the tabs 40, 42, 63, 65 of the desired pocket 31, 32, 52, and 54, respectively, to separate the hook and loops and closures or unzip the zipper closures 50, 70, of the enlarged pockets 44, 64, respectively, to open the desired pocket 30, 32, 44, 52, 54, and 64 insert extended stay articles such as clothing, footwear, toiletries, snacks, reading materials, and other suitable items to be taken on an overnight trip in a manner of organization as befitting the user. Exemplary articles such as a toothpaste tube 104a, toothbrush 104b, pajamas 104c, hairclips 104d, socks 104e, brush 104f, comb 104g, and sandals 104h are illustrated in FIG. 4. When the desired overnight articles have been inserted into the pockets, the opening of the pockets are closed by mating the hook and loop closures or zipping the zipper closures where appropriate.

Turning now to FIGS. 5A–5C, the user may then roll up the sleeping bag 12 into a cylindrical configuration such as illustrated in FIG. 5A and place the rolled up sleeping bag

6

on top of the interior surface 28 of the bag body 14 of the rollup pack 10 about the middle of the bag body. The flat ends of the sleeping bag are generally aligned with the top edge 21 and bottom edge 23 of the bag body but may extend beyond or fall short of the edges as determined by the relationship of the rolled up sleeping bag height in relation to the rollup pack height. The user may then grasp the left wing 18 by the left hand end 25 and fold it on top of the sleeping bag to partially wrap the wing about the circumference of the sleeping bag. Even with the pockets being filled to capacity and possibly resistant to bending, the left wing will fold about the wall 74 onto to the sleeping bag and generally follow the curvature of the sleeping bag. Then, the user may grasp the right hand edge 27 of the bag body and bring the right wing 20 and its buckles 96, 98 proximate their respective counterpart clips 88, 90 of the first pair of pack fasteners 84, 86, respectively. Clip 88 is then inserted into buckle 96 and clip 90 is inserted into buckle 98. This action secures the left wing 18 to the right wing 20 and secures the sleeping bag 12 within the rollup pack 10 to from an integral unit, generally designated 100, for transportation as illustrated in FIG. 5C. The right wing may be inserted above or below the left wing about the sleeping bag as long as the fasteners are exposed and may be coupled together. Preferably, the wings overlap when the ends of the rollup pack are fastened together so that there are no gaps around the circumference of the sleeping bag (FIG. 5C). This is facilitated by attaching the fastener straps at their extreme inner ends (X-patterns in FIG. 2) to the exterior surface 26 of the rollup pack 10 while leaving the remainder of each strap length unattached to the rollup pack. The fastener straps may be adjusted as necessary to tighten the rollup pack 10 about the sleeping bag 12. Given the adjustability of the straps, it is not necessary to roll up the sleeping bag the same way every time and a variety of sleeping bags may be accommodated. The user may then don the rollup pack unit 100 as one would a backpack by slipping left and right arms through the corresponding shoulder straps 80 and 82 and carry the integrated unit 100 on the user's back. Alternatively, the user may grasp both straps with one hand and carry as a piece of luggage.

Once the integrated unit 100 has been transported to the desired destination, the user may set the unit on a relatively elongated flat surface and separate clip 88 from buckle 96 and separate 90 from buckle 98. The user may then peel back the right wing 20 from the left wing 18 exposing the sleeping bag 12 and laying the rollup pack 10 flat. The sleeping bag may then be moved off to a side and the contents of the rollup pack 10 accessed as desired. The viewing windows 72 of each pocket facilitate the removal of the desired articles 104a, 104b, 104c, 104d, 104e, 104f, 104g, 104h in an organized manner.

It will be appreciated that the interior facing pockets 30, 32, 44, 52, 54, and 64 and sleeping bag 12 cooperate to cushion the articles stored in the rollup pack during transportation. In addition, the vertical and inwardly facing openings of each pocket reduce the likelihood of any articles falling out of a pocket during transport. The interior facing pockets also reduce the likelihood of theft of important articles during transport.

Instead of a sleeping bag 12, a beach towel, rolled up cushion, mat or other similar cushioning article may be rolled up into a substantially cylindrical configuration and the rollup pack secured around the towel for carrying articles to the beach, gym, or other location.

While the present invention has been described herein in terms of a number of preferred embodiments, it will be

US 7,171,707 B2

7

appreciated that various changes and improvements may also be made to the invention without departing from the scope and spirit thereof. For example, in this exemplary embodiment, the rollup pack is described as being flexible throughout its length. However, the medial section may include a rigid insert 102 (FIG. 2) or be formed of a formed foam or other cushioning material to conform to the user's back and the curved sleeping bag with the wing wraps remaining flexible to wrap about the substantially cylindrical object being transported.

What is claimed is:

1. A portable rollup pack for use with a sleeping bag rolled into a cylindrical configuration comprising:

an elongated, substantially rectangular bag body including an exterior surface and an interior surface and defining a medial carrying section and two laterally disposed flexible storage wings operable to wrap about said rolled up sleeping bag;

a first fastener element having at least a portion on said exterior surface of one of said wings;

a second complementary fastener element having at least a portion on said exterior surface of the other of said wings and operable to couple with said first fastener element when said wings are brought together;

pockets disposed on said interior surface of said storage wings and at least one intermediate pocket on said interior surface in said medial carrying section, said pockets including openings with closures parallel to at least one side of said bag body, at least one of said pockets being constructed from a substantially waterproof material, and having a viewing window, said pockets constructed to receive substantially flattened or compressible articles; and

at least one carrying strap fastened to said exterior surface whereby a user may place articles into said pockets and said wings of said bag body rolled up with said interior surface abutting a circumference of said rolled up sleeping bag and said fastener elements fastened enabling the transportation of said bag body and sleeping bag as a unit while cushioning said articles with said sleeping bag.

2. The portable rollup pack as set forth in claim 1 wherein: said bag body is flexible throughout its length.

3. The portable rollup pack as set forth in claim 2 further including:

a fold well spaced between a pocket in one of said wings and a pocket in said medial carrying section.

4. The portable rollup pack as set forth in claim 1 further including:

a sleeping bag rolled up into a substantially cylindrical configuration and wrapped within said wings of said rollup pack.

5. The portable rollup pack as set forth in claim 1 wherein:

said first and second fastener elements are a clip and a buckle; and

said bag body includes two shoulder straps connected to said exterior surface with one of said shoulder straps operating as said at least one carrying strap.

6. The portable rollup pack as set forth in claim 1 wherein: said interior surface of said bag body and said pockets are constructed of a non-absorbent material.

7. The portable rollup pack as set forth in claim 1 wherein: said interior surface includes a first pair of pockets vertically stacked on one of said wings.

8

8. The portable rollup pack as set forth in claim 1 wherein: said bag body includes a first edge and a second edge; and said interior surface defines a storage region including a plurality of pockets substantially spanning a length of said bag body and having openings parallel to said edges.

9. The portable rollup pack as set forth in claim 8 wherein: said medial carrying section includes two oversized pockets with zipper closures and a second pair of pockets having hook and loop closures.

10. The portable rollup pack as set forth in claim 1 wherein:

at least one of said pockets includes a transparent surface defining a viewing window.

11. The portable rollup pack as set forth in claim 1 wherein:

said carrying strap is constructed of a webbed material and is adjustable.

12. The portable rollup pack as set forth in claim 1 wherein:

said first fastening element is connected to said exterior surface and includes a stretchable length of material terminating in a buckle.

13. The portable rollup pack as set forth in claim 1 wherein:

said carrying strap is operable to be gripped by hand to carry said bag body when said rollup pack is placed into a rolled up configuration with both of said wings brought together and fastened together.

14. The portable rollup pack as set forth in claim 1 wherein:

said bag body is constructed to lay substantially flat when unrolled and empty of articles.

15. The portable rollup pack as set forth in claim 1 wherein:

at least one of said pockets includes a closure device; and said closure is selected from the group consisting of a zipper and hook and loop fastening elements.

16. The portable rollup pack as set forth in claim 1 wherein:

said bag body includes a marginal edge finished off with a piping.

17. The portable rollup pack as set forth in claim 1 wherein:

said first fastener is a set of two clips attached to said exterior surface and projecting beyond an outermost extent of said wing; and

said second fastener is a set of two buckles aligned with said set of clips and attached to said exterior surface, said buckles project beyond an outermost extent of said other of said wings.

18. The portable rollup pack as set forth in claim 1 wherein:

at least one of said fasteners is adjustable for accommodating a variety of cylindrical dimensions of rolled up sleeping bags.

19. A portable rollup pack adapted to be wrapped around a sleeping bag rolled into a cylindrical configuration, comprising:

an elongated, flexible, substantially rectangular bag body having a medially disposed storage section on an inwardly facing side of said bag body and a support region on an opposing exterior side of said bag body;

a pair of wings extending from said medially disposed storage section and including a secondary storage section, said wings adapted to be wrapped about a sleeping bag;

US 7,171,707 B2

9

a plurality of compartments spanning a substantial length of said inwardly facing side of said bag body in said medially disposed storage section and said secondary storage section and including openings with closures parallel to at least one side of said bag body, at least one of said compartments being constructed from a substantially waterproof material and having a viewing window;

10

a pair of complementary fasteners adapted to secure said wings to one another about a sleeping bag; and

a pair of spaced apart shoulder straps connected to said support region for carrying said bag body as a backpack.

* * * * *

**Global Design Concepts, Inc.**
34 West 33rd Street
New York, New York 10001

as of June 1, 2006

Gem & I Products Inc.
620 Camino de los Mares, #E499
San Clemente, California 97673
Attn: Lisa Landay

Dear Lisa:

1.   This letter is intended to set forth the basic terms by which Global Design Concepts ("GDC") is willing, subject to execution and delivery of the Agreement referred to in Paragraph 2 below, to license from Gem & I Products Inc. ("Gem") the Pack 'N Wrap ™ products (the "Products") which will be added as products to GDC's licensing program.

2.   GDC and Gem will negotiate in good faith, for the purpose of executing and delivering within ninety (90) days from the date hereof, a definitive written agreement with respect to the licensing of the Products (the "Agreement"), a draft of which shall be prepared by GDC's counsel promptly following the execution of this Letter of Intent. The Agreement will contain representations, warranties and covenants as are customary in transactions of the nature contemplated hereby.

3.   As more fully set forth in the Agreement, GDC will use its best efforts to expand the sale of the products, to obtain licenses from its various licensors (such as Disney, Nickelodeon and Barbie) for use with the Products and to otherwise use all of its resources to promote the sale of the Products through its current channels of distribution. In addition to such promotional and sales efforts, under the Agreement, GDC will provide or procure the manufacturing facilities to satisfy customer order requirements for the Products.

4.   As more fully set forth in the Agreement, Gem & I will license the Products to GDC and will provide GDC with initial samples of the Products to support GDC's efforts in obtaining the licenses from its licensors and to solicit interest from its customers. If it shall be determined to be necessary and feasible, GDC shall assist Gem with the design and manufacture of such initial samples. Gem shall actively pursue its pending patents and protection for its other intellectual property on the Products, the success of which shall factor into GDC's obligations under the Agreement. Gem shall fully cooperate with GDC and shall provide GDC with any reasonable assistance and consultation regarding the Products, the scope of which will be more fully defined in the Agreement.

1

5. GDC will incur significant expenses in proceeding with this transaction. Accordingly, in order to induce GDC to proceed, until the passage of the ninety (90) day period set forth in Paragraph 2 above, neither Gem nor any of its officers, directors, shareholders, agents or representatives will offer to license or solicit offers to license the Products and will not otherwise negotiate in respect thereof with anyone other than GDC. Gem will notify GDC of any offers or expressions of interest that are received by Gem within the ninety (90) day period.

6. GDC and Gem represent to each other that all negotiations between them have been conducted without the intervention of any third person, and that there are no brokerage commissions, finders fees or other payments of like nature payable to any person.

7. In the event GDC introduces Gem or the Products to any of its licensors prior to the execution of the Agreement, and the Agreement is not ultimately consummated, Gem agrees not to contact such licensors directly without the express written consent of GDC or unless a compensation arrangement is agreed upon in writing.

This letter is intended only to set forth the basic terms in which GDC is willing to negotiate with the view of entering into the Agreement (and except for the provisions of Paragraphs 4 through 7 and for the obligation to negotiate in good faith within the ninety (90) day period as set forth in Paragraph 2, which shall be legally binding) is not intended to be legally binding on either GDC or Gem. Nothing in this Letter or the Agreement shall be construed to apply to or interfere with any of Gem's pre-existing third party obligations, business relationships, or business plans. Finally, should an Agreement not be entered into for any reason, GDC understands that no license to any rights in the Products has been granted, that all Product samples and related materials will be returned to Gem, and GDC shall continue to abide by the Confidential Disclosure Agreement.

Very truly yours,
GLOBAL DESIGN CORP.

By: _____
Dan Sabbah, President

Agreed and Acknowledged
this _17th_ day of June, 2006

GEM & I PRODUCTS INC.

By: _____
Lisa Landay, President

2

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

I (a) PLAINTIFFS (Check box if you are representing yourself | i))

GEM & I PRODUCTS, INC., a California corporation,

DEFENDANTS

DISNEY CONSUMER PRODUCTS, INC., GLOBAL DESIGN CONCEPTS, INC., JUICY COUTURE, INC., and DOES 1 through 10, inclusive

(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Marc S. Williams
William J. O'Brien
Joseph K. Liu
301 Arizona Avenue, Suite 250
Santa Monica, CA 90401
310-866-5157

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

| | |
|---|---|
| 1 U.S. Government Plaintiff | X 3 Federal Question (U.S. Government Not a Party) |
| 2 U.S. Government Defendant | 4 Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business in this State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

**IV. ORIGIN** (Place an X in one box only.)

X 1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from another district (specify): | 6 Multi-District Litigation | 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** X Yes | No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** | Yes | X No | X **MONEY DEMANDED IN COMPLAINT: $** to be determined

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Patent Infringement under the Patent Act, 35 U.S.C. Sections 271, 281

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| 400 State Reapportionment | 110 Insurance | 310 Airplane | 370 Other Fraud | 510 Motions to Vacate Sentence Habeas Corpus | 710 Fair Labor Standards Act |
| 410 Antitrust | 120 Marine | 315 Airplane Product Liability | 371 Truth in Lending | 530 General | 720 Labor/Mgmt. Relations |
| 430 Banks and Banking | 130 Miller Act | 320 Assault, Libel & Slander | 380 Other Personal Property Damage | 535 Death Penalty | 730 Labor/Mgmt. Reporting & Disclosure Act |
| 450 Commerce/ICC Rates/etc. | 140 Negotiable Instrument | 330 Fed. Employers' Liability | 385 Property Damage Product Liability | 540 Mandamus/ Other | 740 Railway Labor Act |
| 460 Deportation | 150 Recovery of Overpayment & Enforcement of Judgment | 340 Marine | **BANKRUPTCY** | 550 Civil Rights | 790 Other Labor Litigation |
| 470 Racketeer Influenced and Corrupt Organizations | | 345 Marine Product Liability | 422 Appeal 28 USC 158 | 555 Prison Condition | 791 Empl. Ret. Inc. Security Act |
| 480 Consumer Credit | 151 Medicare Act | 350 Motor Vehicle | 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| 490 Cable/Sat TV | 152 Recovery of Defaulted Student Loan (Excl. Veterans) | 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | 610 Agriculture | 820 Copyrights |
| 810 Selective Service | | 360 Other Personal Injury | 441 Voting | 620 Other Food & Drug | X 830 Patent |
| 850 Securities/Commodities/ Exchange | 153 Recovery of Overpayment of Veteran's Benefits | 362 Personal Injury- Med Malpractice | 442 Employment | 625 Drug Related Seizure of Property 21 USC 881 | 840 Trademark |
| 875 Customer Challenge 12 USC 3410 | 160 Stockholders' Suits | 365 Personal Injury- Product Liability | 443 Housing/Acco- mmodations | | **SOCIAL SECURITY** |
| 890 Other Statutory Actions | 190 Other Contract | 368 Asbestos Personal Injury Product Liability | 444 Welfare | 630 Liquor Laws | 861 HIA (1395ff) |
| 891 Agricultural Act | 195 Contract Product Liability | | 445 American with Disabilities - Employment | 640 R.R. & Truck | 862 Black Lung (923) |
| 892 Economic Stabilization Act | 196 Franchise | | | 650 Airline Regs | 863 DIWC/DIWW (405(g)) |
| 893 Environmental Matters | **REAL PROPERTY** | | 446 American with Disabilities - Other | 660 Occupational Safety/Health | 864 SSID Title XVI |
| 894 Energy Allocation Act | 210 Land Condemnation | **IMMIGRATION** | | 690 Other | 865 RSI (405(g)) |
| 895 Freedom of Info. Act | 220 Foreclosure | 462 Naturalization Application | 440 Other Civil Rights | | **FEDERAL TAX SUITS** |
| 900 Appeal of Fee Determi- nation Under Equal Access to Justice | 230 Rent Lease & Ejectment | 463 Habeas Corpus- Alien Detainee | | | 870 Taxes (U.S. Plaintiff or Defendant) |
| 950 Constitutionality of State Statutes | 240 Torts to Land | 465 Other Immigration Actions | | | 871 IRS - Third Party 26 USC 7609 |
| | 245 Tort Product Liability | | | | |
| | 290 All Other Real Property | | | | |

FOR OFFICE USE ONLY: Case Number: SACV10-1051

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08) | CIVIL COVER SHEET | Page 1 of 2
CCD-JS44

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

VIII(a).   IDENTICAL CASES:  Has this action been previously filed in this court and dismissed, remanded or closed?  [ X ] No  [   ] Yes

If yes, list case number(s): _____

VIII(b).   RELATED CASES:  Have any cases been previously filed in this court that are related to the present case?  [ X ] No  [   ] Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)     A.  Arise from the same or closely related transactions, happenings, or events; or

                                 B.  Call for determination of the same or substantially related or similar questions of law and fact; or

                                 C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

                                 D.  Involve the same patent, trademark or copyright, __and__ one of the factors identified above in a, b or c also is present.

IX.  VENUE:  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

      Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

      Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| All named Defendants - Los Angeles | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.

      Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties

Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER):  _____   Date July 12, 2010

                                            Joseph K. Liu

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |



# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Andrew Guilford and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV10- 1051 AG  (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

====================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[X] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEM & I PRODUCTS, INC., a California corporation, | CASE NUMBER |
| PLAINTIFF(S) | ~~SACV10-1051- AG (RNB)~~ FOR OFFICE USE ONLY |
| v. | |
| DISNEY CONSUMER PRODUCTS, INC., a California corporation;<br>(CONTINUED IN ATTACHMENT A) | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within 21_____ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached [X] complaint [ ] _____ amended complaint [ ] counterclaim [ ] cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, One LLP_____ , whose address is 301 Arizona Avenue, Suite 250, Santa Monica, California 90401_____ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   _T 2 JUL 2010_   By:   MARGENDAVIS   FOR OFFICE USE ONLY   SEAL

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

---

CV-01A (12/07)                           SUMMONS                           CCD-1A

## ATTACHMENT A

GEM & I PRODUCTS, INC., a California corporation,

Plaintiff,

v.

DISNEY CONSUMER PRODUCTS, INC., a California corporation; GLOBAL DESIGN
CONCEPTS, INC., a Delaware corporation;  JUICY COUTURE, INC., a California corporation;
and DOES 1 through 10, inclusive,

Defendants.